RECEIVED

NOV 13 2018

AT 8:30_____ M
WILLIAM T. WALSH
CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | <u>INFORMATION</u> |
| | ) | |
| | ) | |
| v. | ) | CASE NO. 18-cr-677-01(MAS) |
| | ) | |
| | ) | Violation: |
| ANDREW GUGLIELMO, | ) | Conspiracy 18 U.S.C. § 371 |
| RICHARD GUGLIELMO, Jr., & | ) | |
| HAMDI LATIF | ) | |
| | ) | |

The Assistant Attorney General for the Environment and Natural Resources Division of
the United States Department of Justice charges that, at all times relevant to this information, in
the District of New Jersey:

### Introduction

1.      Flexabar Corporation ("Flexabar") was a New Jersey corporation located in
Lakewood, New Jersey. Flexabar produced paints and coatings for a variety of commercial uses
including for fishing and aquaculture applications. Among those were paints containing
pesticides that inhibit the growth of seaweed, algae, barnacles, mollusks, and other nuisance
organisms on surfaces submerged in water. Such coatings are referred to as antifouling paints.
All pesticides produced or distributed in the United States are regulated by the United States
Environmental Protection Agency ("EPA") as described below.

**The Federal Pesticide Control Law**

2.      The manufacture, distribution, and use of pesticides is regulated by the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), Title 7, United States Code ("U.S.C."), Sections 136, *et seq.*, and the regulations promulgated under its authority by the EPA.

3.      The term "pesticide" is defined in FIFRA as any substance or mixture of substances intended for preventing, destroying, repelling, or mitigating any pest.  7 U.S.C. § 136(u).

4.      Under FIFRA, no person may distribute or sell any pesticide in the United States without its first being registered with EPA.  Before registering a pesticide, EPA requires that it be tested in order to determine its impact upon human health and the environment and in order to develop specific instructions and restrictions for its safe and effective use.  These instructions, restrictions, and warnings must be clearly stated on a pesticide's label and affixed to every container of the pesticide that is distributed or sold.  Pesticide producers are required to maintain records demonstrating EPA's registration of the products they manufacture and distribute.  7 U.S.C. §§ 136a, 136f.

5.      FIFRA prohibits the sale or distribution of any pesticide that is not registered by EPA, that bears false claims or claims inconsistent with the terms of its registration, or that is adulterated or misbranded.  7 U.S.C. § 136j(a)(1)(A).

6.      A pesticide is defined to be adulterated if any substance has been substituted wholly or in part for the pesticide identified on the product's registration.  7 U.S.C. § 136(c).

7.      A pesticide is defined to be misbranded if its label bears any statement that is false or misleading or if the label does not contain a warning or direction or restriction for its use that is required by EPA in its registration of the product or in any subsequent EPA order amending that registration.  7 U.S.C. § 136q.

2

8.      FIFRA prohibits the use of any registered pesticide in a manner inconsistent with its labeling as prescribed under the terms of its registration.  7 U.S.C. § 136j(a)(2)(G).

9.      Under FIFRA it is unlawful for any person knowingly to falsify, among other things, all or part of any application for pesticide registration, any information submitted to EPA pursuant to FIFRA section 136e (registration requirements for pesticide manufacturers), any records required to be maintained pursuant to FIFRA, or any report filed under the statute.  7 U.S.C. § 136j(a)(2)(M).

## Factual Background

### A. *The Pesticide Tributyltin*

10.     Tributyltin or "TBT" is a class of organotin compounds that prevents the growth of seaweed, barnacles, and other marine organisms on submerged surfaces.  In the 1960s, TBT became an ingredient in water resistant paint marketed as an antifouling coating.  By the 1970s, TBT antifouling paints were widely used in the shipping and fishing industries.  However, these coatings leach their active ingredient into sea water.  Researchers began to find high concentrations of TBT in marinas, ports, harbors, and the open ocean.  Scientific studies showed TBT to be extremely harmful to marine life, causing shell deformation, reproductive aberrations and endocrine disruption.  TBT bio-accumulates in exposed organisms and concentrates in predator species including marine mammals.

11.     On June 16, 1988, Congress passed The Organotin Antifouling Paint Control Act of 1988 (Pub. L. 100-333) stating, "Laboratory and field studies show that organotin is very toxic to marine and freshwater organisms at very low levels."  The law placed restrictions on the sale and use of TBT antifouling paints and mandated further study to enable EPA to develop additional TBT regulations.

**B.  Flexabar's Pesticide Products**

12.      In 1982, Flexabar obtained EPA registrations for two products in which the sole

active ingredient was the pesticide tributyltin: Flextin Wood Treatment Concentrate (EPA

Registration No.: 9339-12) ("Flextin") and Flexgard Waterbase Preservative (EPA Registration

No.: 9339-14) ("Flexgard").  At the time of their registration, Flexabar did not identify either

product as a marine antifoulant, nor did EPA approve them for use as such.

13.      However, from the time of their registration in 1982 until in or about 2015, about

thirty-three years, Flexabar sold these coatings primarily to the fishing industry as marine

antifoulants to prevent the growth of seaweed, barnacles, and other nuisance organisms on crab

traps and other marine equipment.

14.      In December 2002, Flexabar obtained an EPA registration for the antifouling

paint Flexgard II Waterbase Wire Trap/Crab Pot Antifouling Paint (EPA Reg. No.: 9339-21)

("Flexgard II").  Flexabar initially proposed that it contain two active ingredients, TBT and

cuprous oxide.  However, because of TBT's toxicity to marine life, EPA approved the product on

condition that Flexabar would remove TBT from the formulation and Flexgard II's sole active

ingredient would be cuprous oxide.  Flexabar agreed and revised the registered product

formulation accordingly to eliminate TBT from Flexgard II.

**C.  Flexabar's Regulatory History**

15.      To prevent the toxic impact on marine life from the misuse of TBT, in 1991, EPA

sought to reinforce its limitations on the use of Flexabar's TBT products.  Since Flexgard was

never approved for use as an antifoulant, EPA directed Flexabar to clarify the intended uses on

its label to ensure that treated items were not placed in water. EPA explicitly limited Flexgard to use as a wood preservative and as a mold and mildew retardant on ropes and netting not submerged in water. In a May 8, 1991 letter to Flexabar, EPA notified the company that it was required to modify its label "[t]o assure that the product is not used as an anti-fouling treatment on surfaces in contact with the water." In a May 24, 1991 letter to EPA, Flexabar agreed to change the labels of its TBT-based products as directed.

16.     In a March 7, 1996 letter, EPA notified Flexabar that it was aware that the company had failed to make the label changes it had agreed to almost five years earlier. In addition to clarifying the non-marine uses of Flexgard, EPA again directed Flexabar to state on its Flexgard label that its use on surfaces below the waterline including crab, lobster, and bass pots was prohibited.

17.     Following a series of communications with Flexabar in which the company continued to evade the restrictions EPA required, in a December 20, 1996 letter, EPA warned Flexabar that its labels for TBT-based products "contain unacceptable use(s). This includes any application to wood surfaces …in contact with water such as pilings or crab, lobster or bass pots, or on boat surfaces below the water line. Such uses appear on the labeling of the above products and must be deleted."

18.     In October 1997, Flexabar received a fax from one of its distributors which included a stop sale order from Virginia's Department of Agriculture stating that Flexabar's Flexgard product could not be used as a marine antifoulant, it "must not be recommended for use (application) on crabpots or other sites not listed on the pesticide label."

19.     In a January 4, 2002 letter sent to all registrants of pesticides containing TBT, EPA notified Flexabar of the anticipated international prohibition of the use of TBT on ship hulls

because of its toxicity to marine life. *The International Maritime Convention on the Control of Harmful Anti-Fouling Systems on Ships,* London, October 5, 2001. EPA stated that it expected to cancel all TBT-based pesticide products to eliminate them from the market by the following year, January 2003. It urged all TBT registrants to reduce TBT purchases and TBT pesticide production in order to meet the anticipated ban.

20.     In a March 28, 2002 email to Flexabar, EPA confirmed the agreement it reached with Flexabar that the company would include on its Flextin and Flexgard labels the warning, "This product is not to be used as antifouling on ships, boats, wood pilings, or crab, lobster, or bass pots."

21.     Flexabar maintained its registrations for its TBT products by continuing to misrepresent to EPA that they were being marketed as wood preservatives and mildew preventatives on surfaces not in contact with water. On January 19, 2006, EPA issued another label for Flextin containing the following language: "This product is not to be used as antifouling on ships, boats, wood pilings, OR crab, lobster, or bass pots and traps." In spite of this, Flexabar continued to sell its TBT-based products to the fishing industry for prohibited marine uses.

22.     On February 6, 2013, EPA issued a Federal Register Notice that officially canceled the FIFRA registrations for Flexabar's two TBT products, Flextin and Flexgard. The cancellation provided that Flexabar could not manufacture any more of these pesticides but could continue to sell and distribute existing stocks of the products for one year, until February 6, 2014. This was fully explained to Defendants ANDREW GUGLIELMO and HAMDI LATIF by a pesticide expert with whom the company consulted. Those defendants communicated these restrictions on the manufacture and sale of Flexabar's TBT products to Defendant RICHARD GUGLIELMO, Jr. and another Flexabar official.

23.     In a February 26, 2014 email to Flexabar management, an employee reported a news article about the indictment of a Florida company and its managers for the continued production and sale of antifouling paint containing TBT past the date allowed in EPA's cancellation order. The news article described the federal criminal charges that resulted from the Florida company's deception of EPA to conceal its violations of agency orders to stop producing and selling antifouling paints containing TBT.

## COUNT 1
### Conspiracy to Defraud the United States and to Violate Federal Pesticide Control Laws
### 18 U.S.C. § 371

### Defendants

24.     In or about 2012, Defendant ANDREW GUGLIELMO became the Chief Executive and Chief Financial Officer of Flexabar, and was involved in the regular conduct of the company's business. He has been employed at Flexabar since 1985 in a variety of operational and managerial roles.

25.     In or about 2007, Defendant RICHARD GUGLIELMO, Jr. became President of Flexabar and was involved in the regular conduct of the company's business. He has been employed at Flexabar since 1971 in a variety of operational and managerial roles.

26.     Defendant HAMDI LATIF was the Technical Director of Flexabar responsible for the formulation of the company's products and for assuring compliance with the regulations governing the manufacture, sale, and labeling of the pesticides it produced. He has been employed at Flexabar since 1976.

### The Conspiracy

27.     Beginning at a time unknown to the government, but no later than in or about June 2008 and continuing thereafter until in or about January 2016, in the District of New Jersey, and elsewhere, Defendants ANDREW GUGLIELMO, RICHARD GUGLIELMO, Jr., HAMDI

7

LATIF, and others known and unknown to the government did knowingly and willfully combine, conspire, and agree to commit the following offenses against the United States and the laws thereof:

 (i) To defraud the United States by hindering, impeding, and obstructing, by deceit and dishonest means, the lawful functions of EPA, an agency of the United States, to implement and enforce FIFRA, Title 7, U.S.C. § 136, *et seq.*, and the regulations promulgated under its authority, in violation of Title 18, U.S.C. § 371 and;

 (ii) To commit violations of FIFRA, Title 7, U.S.C. § 136, *et seq.*, including but not limited to: (a) manufacturing and selling products containing the regulated pesticide TBT for purposes prohibited by EPA, (b) manufacturing and selling adulterated and misbranded TBT pesticides, failing to place on the product labels the use restrictions ordered by EPA, (c) violating a cancellation order by continuing to import TBT for the manufacture and sale of an unregistered pesticide, (d) selling an unregistered pesticide, and (e) providing false information to EPA regarding the manufacture, sale, and use of Flexabar's TBT products.

## Purpose of the Conspiracy

 28. It was the objective and purpose of Defendants ANDREW GUGLIELMO, RICHARD GUGLIELMO, Jr., HAMDI LATIF, and their co-conspirators in formulating, developing, and implementing this conspiracy to profit from the manufacture and sale of TBT-based pesticides by evading the use restrictions and labeling requirements mandated by EPA and by continuing to produce and sell these pesticides past the dates at which these activities were required by law to cease.

**Means and Methods of the Conspiracy**

29.　　To carry out the conspiracy and effect its unlawful objects, Defendants ANDREW GUGLIELMO, RICHARD GUGLIELMO, Jr., HAMDI LATIF and their co-conspirators engaged in conduct including but not limited to the following:

a. For decades, concealing from EPA that they were manufacturing and marketing Flexabar products containing TBT to the fishing industry for their illegal use as antifoulants on crab and lobster traps and other fishing gear;

b. Falsely telling EPA that they would comply with EPA directives to include on the labels of Flexabar's TBT products instructions that they could not be used on surfaces submerged in water but, for years, failing to do so;

c. Marketing Flexabar's regulated pesticides to the crabbing industry precisely for the purposes that EPA had forbidden even after they complied with EPA's labeling requirements;

d. Attempting to purchase and purchasing TBT from suppliers even after February 6, 2013, when EPA cancelled the registration of Flexabar's TBT-containing products and prohibited the import of TBT for use as a pesticide;

e. Making false statements about the intended use of the TBT they sought to purchase in an effort to evade laws prohibiting Flexabar's importation and use of TBT as a pesticide;

f. Continuing to manufacture pesticides containing TBT after February 6, 2013, when the manufacture of pesticide products containing TBT was prohibited;

g. Selling pesticides containing TBT illegally manufactured after February 6, 2013, when the sale of these pesticides was prohibited.

h. Producing and selling an unregistered pesticide, by surreptitiously adding the banned toxin, TBT to the formula of Flexgard II.

**Overt Acts**

30.    In furtherance of the conspiracy and in order to achieve the objects thereof, defendants committed the following acts:

**Overt Act 1:**   For many years and continuing as late as May 2015, Defendants ANDREW GUGLIELMO, RICHARD GUGLIELMO, Jr., and others distributed an advertisement at watermen trade shows and through other means to crab fishermen and their suppliers recommending Flexabar's TBT-based products for use as a "Crab Pot Dip" to prevent the growth of marine organisms on fishing gear, an unapproved use of TBT-based products that EPA specifically prohibited in a May 8, 1991 letter to Flexabar.

**Overt Act 2:**  In a June 6, 2008 response to an EPA inquiry as to the uses for which Flexabar's TBT based Flexgard was being sold, Defendant HAMDI LATIF, knowing the fishing industry to be Flexabar's primary market, falsely claimed, "Use of this product for nylon webbing for these purposes [golf driving ranges and baseball batting cages] continues to be a major use for this product, for which registration should continue." Defendant HAMDI LATIF sent a copy of this letter to Defendants ANDREW GUGLIELMO, RICHARD GUGLIELMO, Jr., and others at Flexabar.

**Overt Act 3:**   In order to import TBT through U.S. Customs and to avoid having to report it to EPA, Defendant ANDREW GUGLIELMO, in a January 31, 2013 email to a chemical supplier, stated the "TBTO [TBT] is used to manufacturer (sic) our end use product used as a wood preservative."

**Overt Act 4:**  A February 20, 2013 email sent by a Flexabar employee at the direction of Defendant ANDREW GUGLIELMO asked a TBT supplier to backdate Flexabar's TBT order to February 1, 2013, a date prior to EPA's cancellation of the pesticide.

**Overt Act 5:**  In order to import TBT through U.S. Customs and avoid having to report it to EPA, on or about July 17, 2013, with the knowledge and approval of other co-conspirators, Defendant RICHARD GUGLIELMO, Jr. sent a letter to the supplier falsely stating, "the end use of this raw material [TBT] is used as a heat stabilizer in the production of PVC."

**Overt Act 6:**  In or about March 2014, a co-conspirator sold Flexgard to a fishing industry distributor bearing labels that did not contain the restriction EPA had required prohibiting its use on crab pots and other fishing gear.

**Overt Act 7:**  Defendant HAMDI LATIF signed and submitted to EPA a January 20, 2015 "Confidential Statement of Formula" for Flexgard II that reported its only pesticide ingredient to be EPA-approved cuprous oxide but concealed by omission Flexabar's illegal addition of TBT to Flexgard II throughout 2014.

**Overt Act 8:**  Over two years after EPA had prohibited the manufacture of any pesticide containing TBT, on or about June 8, 2015, in recipe instructions called "batch tickets," Defendant HAMDI LATIF directed Flexabar's production staff to include TBT as an ingredient in the formulation of Flexgard II.

**Overt Act 9:**  In January 7, 2016 interviews with federal agents, Defendants ANDREW GUGLIELMO, RICHARD GUGLIELMO, Jr., and HAMDI LATIF falsely stated that Flexabar had not ordered any TBT after EPA cancelled its registration on February 6, 2013, and that Flexabar had stopped using TBT in any of its products years earlier.

In violation of Title 18, United States Code Section 371.


JEFFREY H. WOOD
Acting Assistant Attorney General
Environment and Natural Resources Division

w/p 10/22

By: _____

Jeremy F. Korzenik
Senior Trial Attorney
Environmental Crimes Section

By: _____

Adam Cullman
Trial Attorney
Environmental Crimes Section